

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No. 1:17-mj-81 |
| ) | |
| JESUS R. MUCHACHO, ) | **UNDER SEAL** |
| ) | (Pursuant to Local Rule 49(B)) |
| Defendant. ) | |

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT**

Michael T. Benedict, being duly sworn, deposes and states as follows:

**I.   INTRODUCTION**

1.   I am a Senior Special Agent with the United States Customs and Border Protection, Office of Professional Responsibility ("CBP-OPR") and am currently assigned to the SAC Washington, Special Investigations Unit. Between in or about February 2015 and in or about February 2017, I served in a similar capacity with CBP-OPR's National Security Investigations Group, which is also located in Washington, D.C. Among other things, CBP-OPR investigates administrative and criminal allegations of misconduct involving CBP employees.

2.   Prior to my employment with CBP-OPR, I was a Special Agent with the U.S. Department of Commerce for approximately nine years and a police officer with the U.S. Department of Defense's Pentagon Force Protection Agency for approximately six years. I am a graduate of the Federal Law Enforcement Training Center's ("FLETC") Mixed Basic Police and Criminal Investigator Training Programs, I have a degree in criminal justice, and I have completed courses in law enforcement and investigative techniques, including CBP's Internal Affairs Special Agent Training and FLETC courses focusing on fraud and public corruption.

3. I am a law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), and am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516. In this capacity, I have investigated crimes committed by persons against the United States, including allegations involving CBP employees that relate to fraud, public corruption, unauthorized computer access, and obstruction and false statement offenses.

4. The information in this affidavit is based on my personal knowledge, evidence developed during the investigation, and information provided to me by others involved in this investigation, including other CBP-OPR special agents and employees, witnesses, and special agents from the U.S. Federal Bureau of Investigation ("FBI"), which is investigating this matter jointly with the CBP-OPR. Because this affidavit is submitted for the purpose of establishing probable cause in support of the related criminal complaint, it does not set forth each and every fact that I or others have learned during the course of this investigation.

5. Based on your affiant's training and experience, information provided by witnesses, documentary evidence (including evidence obtained by search warrant and grand jury subpoenas), and other evidence gathered during the investigation, your affiant respectfully submits there is probable cause to believe that JESUS R. MUCHACHO, a CBP Officer, made false statements to federal law enforcement officers and during MUCHACHO's background investigations, in violation of 18 U.S.C. § 1001.

II. **FACTS ESTABLISHING PROBABLE CAUSE**

    A. **Background**

6. The defendant, JESUS R. MUCHACHO, is a naturalized U.S. citizen from Maracay, Venezuela. MUCHACHO has been employed as a CBP Officer since on or about July

27, 2009. After initially working in North Dakota, MUCHACHO, on or about December 15, 2013, was re-assigned to Herndon, Virginia as a Program Manager in CBP's National Targeting Center Cargo ("NTCC"). The NTCC is a 24/7 operations center that targets and coordinates the examination of high-risk cargo entering the United States and those persons associated with these shipments. These examinations support CBP's international and domestic anti-terrorism efforts.

7. As a CBP Officer and Program Manager at the NTCC, MUCHACHO was granted a Top Secret security clearance to perform his official duties and responsibilities. To obtain and maintain a Top Secret security clearance, CBP employees are required to complete a background investigation when they are hired and, every five years thereafter, must undergo a periodic reinvestigation. Among other things, the background investigations and periodic reinvestigations include the following: (a) the completion of a Standard Form 86, Questionnaire for National Security Positions ("SF-86"); (b) participation in a personal subject interview (conducted by an investigator); and (c) completion of an employee supplemental questionnaire.

8. CBP employees undergoing background investigations for national security positions must affirm that they have provided truthful and accurate information. They are also warned and advised that providing false or misleading information during their background investigations could result in criminal prosecution and may affect their eligibility for access to classified information; eligibility for a sensitive position; ability to obtain or retain Federal or contract employment; eligibility for physical and logical access to federally controlled facilities or information systems; and other potential consequences, such as negative impacts to their employment prospects and job status, debarment from Federal service, and removal.

9.      MUCHACHO underwent a background investigation in 2009, when he was hired by CBP, and a five-year, periodic reinvestigation in or about March and April 2014. In or about June 2016, MUCHACHO also completed and submitted an application to obtain access to sensitive compartmented information ("SCI"). SCI is information concerning or derived from highly sensitive sources, methods, or analytical processes. SCI access is only granted to CBP employees who have a current Top Secret security clearance and a current single scope background investigation ("SSBI").

10.     MUCHACHO's Top Secret security clearance gave him access to classified national security information and sensitive information.[1] MUCHACHO was also granted access to protected, law enforcement electronic databases, including CBP's Targeting Framework ("TF"), the Automated Targeting System ("ATS"), the National Crime Information Center ("NCIC"), and TECS (formerly known as the U.S. Department of Treasury Enforcement Communication System). Through his system access, MUCHACHO also had access to the FBI's Terrorist Screening Database ("TSDB"), which contains terrorist identifiers such as names, dates of birth, place of birth, biometric and photographic data, passport and/or driver's license information, and other biographical or associated information relating to a subject's identity. The TSDB exports these identifiers into TECS and ATS (via the U.S. Department of Homeland Security's Watchlist Service) for CBP's use in assessing the risk and/or threat posed

---

[1] "Classified National Security Information" is information created or received by an agency of the federal government or a government contractor that would damage national security if improperly released as defined by Executive Order 12958. "Sensitive" information is information that is controlled and access restricted by statute or regulation, or defined by Department of Homeland Security Directive, the release of which could cause harm to a person's privacy or welfare, adversely impact economic or industrial institutions, or compromise programs or operations essential to the safeguarding of our national interests. "Sensitive" information is routinely identified by the caveats "For Official Use Only" and "Law Enforcement Sensitive."

by a person or their related goods and cargo entering or exiting the country. In addition, the ATS and TF databases contain multiple query functions, including what is known as ATSQ or "Super Query." Super Query allows users to search multiple data sources simultaneously, including the U.S. Department of State's Consular Consolidated Database ("CCD"), Arrival and Departure Information System ("ADIS"), NCIC, TECS and the commercial Lexis-Nexis database.

11. Because the contents of the consolidated terrorist watchlist are derived from classified and sensitive law enforcement and intelligence information, the TSC cannot confirm or deny whether an individual is on the watchlist and the contents of the watchlist cannot be publicly disclosed. Any information regarding whether or not a specific individual is listed in the TSDB is also considered law enforcement sensitive and is required to be treated as such, including taking the necessary steps to ensure the information is not disclosed to the subject or any other unauthorized individuals. The safeguarding of watchlist information protects the government's operational counterterrorism and intelligence collection objectives, as well as the personal safety of those involved in counterterrorism investigations.

12. Because the information contained within these various law enforcement database systems is "sensitive" and cannot be queried without an official government purpose or disclosed to anyone without proper authorization, access to these systems is only granted to employees of the U.S. Government who have successfully completed a background investigation, who are authorized by position, and who have a need to know.

13. The CBP provided training to MUCHACHO regarding the foregoing policies. Moreover, when accessing the CBP's computer systems and law enforcement databases, CBP personnel must affirmatively acknowledge U.S. Government policies through logon computer banners which set forth access and use restrictions.

B. <u>The Investigation</u>

14. On or about May 18, 2015, the CBP-OPR received an allegation that MUCHACHO was using an undisclosed Venezuelan passport to travel internationally. Because MUCHACHO holds a Top Secret security clearance, he is required to inform the U.S. Government in the event he obtains non-U.S. travel documents. Dual citizens, moreover, are typically required to sign an agreement that specifies actions which should not be taken by the employee regarding their dual citizenship.

15. A review of MUCHACHO's travel records confirmed that he was traveling to and from Venezuela utilizing passports issued by both Venezuela and the United States.[2]

16. A review of MUCHACHO's government e-mail account and his history of database queries indicated that: (a) MUCHACHO was sending and receiving e-mails to and from his government e-mail account to one of his personal e-mail accounts; (b) MUCHACHO exceeded his authorized access by searching law enforcement databases and accessing sensitive information contained in multiple databases for unofficial purposes; and (c) MUCHACHO made unauthorized disclosures of law enforcement and sensitive information to third parties, including foreign associates without a need to know.

---

[2] Specifically, on or about April 22, 2015, MUCHACHO flew from Miami to Caracas, Venezuela, utilizing Venezuelan Passport No. 076135118. MUCHACHO returned to Miami on or about May 4, 2015, utilizing U.S. Passport No. 307376237. On or about November 12, 2015, MUCHACHO flew from Miami to Barcelona, Venezuela utilizing Venezuelan Passport No. 076135118. He returned to Miami on or about May 4, 2015, utilizing U.S. Passport No. 307376237. On or about February 26, 2016, MUCHACHO flew from Houston to Caracas, Venezuela utilizing Venezuelan passport No. 076135118. He returned to Houston on or about March 7, 2016, utilizing U.S. passport No. 531105040. On or about August 10, 2016 MUCHACHO flew from Newark to Valencia, Venezuela utilizing Venezuelan Passport No. 076135118. He returned to Newark on or about August 22, 2016 utilizing U.S. Passport No. 531105040. On or about November 9, 2016, MUCHACHO flew from Washington Dulles Airport to Valencia, Venezuela utilizing Venezuelan passport No. V13357302. He returned to Washington on or about November 29, 2016 utilizing U.S. Passport No. 531105040.

17. For instance, between in or about October 2014 and in or about March 2016, MUCHACHO repeatedly conducted unauthorized searches across several law enforcement and sensitive databases to assist a Venezuelan national who was seeking information about himself, his wife, and the location of his children in connection with an international custody dispute. After conducting the unauthorized searches, MUCHACHO forwarded portions of the search results to his personal e-mail account and then provided the information to the Venezuelan national.

18. Likewise, in or about February 2015, MUCHACHO conducted several unauthorized searches relating to a lawful permanent resident ("LPR") who was later determined to be his friend's mother. After conducting the unauthorized searches, MUCHACHO forwarded a letter, on CBP letterhead, to his personal e-mail account and the friend's e-mail account. The letter requested that the U.S. Citizenship and Immigration Service correct errors contained in its official immigration records relating to the LPR.

19. MUCHACHO also sent highly sensitive documents from his government e-mail account to his personal e-mail account. For example, on or about December 23, 2015, MUCHACHO sent an e-mail to his personal e-mail account that contained six attachments, one of which was labeled "FSU EVENT SAMPLE AND NOTES.docx." Analysis of this document revealed that it contained 103 TF event numbers. Event numbers are unique identifiers that identify entries made into the TF database. Information relating to TSDB status information was found in 91 of these events and Personally Identifiable Information ("PII") was found in 61 of the events. Also contained within the e-mail were 83 additional references that did not contain specific event numbers but did contain TSDB and/or PII information. Of the additional 83 entries in the document, 12 entries contained PII and 57 contained TSDB references.

20. The TSDB status information contained in the document is sensitive because it associates a name with whether the U.S. Government has information concerning that person related to terrorist activity. Although MUCHACHO's current duties require the access and use of such information, it should not be sent outside of official CBP computer systems or shared with anyone without a valid need to know. There was no official purpose or basis to warrant MUCHACHO electronically transmitting sensitive TSDB and PII information from his official U.S. Government computer system to his personal e-mail account.

21. Similarly, on or about March 20, 2016, at approximately 1:31 p.m., MUCHACHO sent four e-mails from his government e-mail account to his personal e-mail account with the subjects "TSBD 1," "TSBD 2," "TSBD 3," and "TSBD 4." The e-mails contained multiple attachments including the following sensitive documents:

    a. A PowerPoint presentation, dated October 16, 2013, titled "National Targeting Center" and marked "For Official Use Only." The presentation explained how and why the U.S. Government nominates individuals for entry into the TSDB, and it contained specifics regarding the basis for TSDB nominations, conduct by an individual that triggers TSDB entry, and TSDB records identification, subject codes, and nominating agency codes.

    b. A Microsoft Word file, dated September 3, 2014, which contained the internal CBP process for entering and nominating arriving passengers, and submitting nomination requests to the NCTC via the Targeting Framework.

    c. A password protected PDF file (marked "UNCLASSIFIED // FOUO") that contained handling and category codes for a classified terrorist screening database.

### C. MUCHACHO's Disclosures During His Background Investigations

22. On or about March 13, 2014, MUCHACHO signed, certified, and submitted his SF-86 in connection with a periodic reinvestigation. MUCHACHO falsely answered "no" to a question asking whether he currently has or ever held dual/multiple citizenship.[3] MUCHACHO also falsely answered "no" to a question about his contact with foreign governments.[4] In addition, CBP's Personnel Security Office advised that MUCHACHO did not sign a dual citizenship agreement because he indicated on the SF-86 that he was not a dual citizen and did not have a current foreign passport.

23. On or about April 7, 2014, in Herndon, Virginia, MUCHACHO signed, certified, and submitted an employee supplemental questionnaire as part of his periodic reinvestigation. He was also interviewed by a background investigator. During the interview, MUCHACHO stated that he was a naturalized U.S. citizen, and he falsely stated that he was not claiming dual citizenship with another country.

24. On or about June 13, 2016, MUCHACHO completed an electronic application to obtain SCI clearance. Although the application for SCI clearance did not have to be signed by the applicant, MUCHACHO falsely answered "no" on a question asking whether he held dual citizenship.

---

[3] During his initial SF-86, in 2009, MUCHACHO did not disclose on the form that he had dual citizenship. However, during a supplemental interview at the time of his hiring, he later admitted this fact to an investigator.

[4] Although MUCHACHO reported an expired Venezuelan passport (No. 13357302) on his SF-86, he did not mention that he had applied to the Venezuelan government (in or about January 2013) to obtain a new Venezuelan passport.

### D. MUCHACHO's Interviews in 2016

25. On or about November 29, 2016, upon his arrival at Dulles International Airport (from Venezuela via Panama), MUCHACHO was questioned by CBP officers during a secondary inspection. MUCHACHO falsely told the officers he had an expired Venezuelan passport, which he left at his residence in the United States. When confronted on this topic, MUCHACHO eventually acknowledged that he departed the United States with a Venezuelan passport that was stolen upon his arrival in Venezuela.

26. On or about December 1, 2016, MUCHACHO participated in a voluntarily interview in Herndon, Virginia that was recorded by the case agents. After signing a *Garrity* waiver form, MUCHACHO falsely stated that: (a) he never sent CBP or U.S. government information outside of the CBP systems; (b) he never sent work or U.S. government information to his personal e-mail accounts; (c) no one seriously asked him for official help (although family members and friends jokingly asked him for help); (d) no one ever asked him for CBP or U.S. government information; (e) he never provided anyone with CBP or U.S. government information without an authorized need to know; (f) he never conducted CBP or U.S. government database checks on friends or family or anyone other than for official purposes. MUCHACHO subsequently admitted during the interview to doing all of these things. For instance, he later admitted in the interview that he sent CBP information to his personal e-mail account, which he knew was wrong; he checked databases for information relating to friends and relatives, which he knew was wrong; and he disclosed sensitive information to associates, but not in exchange for bribes.

27. On or about December 1, 2016, during the same voluntary interview, MUCHACHO falsely stated that he obtained his Venezuelan passport immediately prior to his

trip in November 2016 and that, prior to then, he traveled in and out of Venezuela on his U.S. passport. MUCHACHO later admitted during the interview that, for the past few years, he had been traveling into Venezuela on a Venezuelan passport.[5]

28.  On or about December 1, 2016, during the same voluntary interview, MUCHACHO admitted that he made false statements on his March 2014 SF-86 and his June 2016 application for SCI clearance.[6]

## II.  CONCLUSION

29.  Based on the foregoing, your affiant submits there is probable cause to believe that JESUS R. MUCHACHO made false statements, in violation of 18 U.S.C. § 1001. Your affiant therefore respectfully requests the issuance of a criminal complaint and an arrest warrant.

_____
Michael T. Benedict
Senior Special Agent, U.S. Customs and Border Protection

Subscribed and sworn to me this 21st day of February 2017.
_____/s/_____
Michael S. Nachmanoff
United States Magistrate Judge
UNITED STATES MAGISTRATE JUDGE

---

[5] Travel records confirm that MUCHACHO started using the Venezuelan passport in 2015. MUCHACHO stated during the interview that he did not disclose the existence of the Venezuelan passport because his co-workers had told him he was not supposed to have a Venezuelan passport due to his high security clearance.

[6] MUCHACHO admitted that he failed to disclose on his SF-86 that he had applied for a Venezuelan passport. However, he said he did not disclose this fact because he was unsure if it had been formally issued by the Venezuelan government at the time he was completing the SF-86. Evidence indicates that MUCHACHO completed the application for his second passport in or about January 2013.